UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARVEY STONE III,

                Plaintiff,

v.

ROSE CITY MOTORS, INC.,

                Defendant.

_____/

COMPLAINT

## I.      Introduction

1.      Plaintiff Harvey Stone III purchased a Cadillac on credit from defendant Rose City Motors, Inc. ("RCM").  The retail installment sales contract stated that Mr. Stone was the borrower and that RCM was the creditor.  RCM later attempted to sell the contract to a third party investor but was unsuccessful in doing so.  Under Michigan law, RCM was required to honor its contract with Mr. Stone and accept Mr. Stone's monthly payments.  Instead, RCM refused Mr. Stone's payments, unlawfully repossessed and converted Mr. Stone's vehicle and kept Mr. Stone's down payment.

2.      Defendant Rose City Motors, Inc. ("RCM") sells motor vehicles to consumers in credit transactions, using retail installment sales contracts.  RCM specifically markets to consumers with low income and low credit scores.

3.      A typical credit transaction is initiated when the consumer completes a simple credit application.  RCM then obtains the consumer's credit report.  RCM then attempts *via* the

1

internet, fax or other means to obtain the tentative approval of an investment company that specializes in purchasing motor vehicle retail installment sales contracts to purchase the contract from RCM and "fund" the deal. Funding takes place pursuant to pre-existing agreements between RCM and various investment companies. These agreements state the terms under which each investment company will purchase contracts from RCM. The preliminary arrangement of the investment company to purchase a particular contract from RCM is merely conditional and will specify additional terms ("stipulations") which must be met before the investment company will actually purchase the contract from RCM. Typical stipulations include a subsequent telephone interview of the consumer by an employee of the investment company, and verification of the consumer's residency, employment and income.

4.     Once RCM has received an investment company's tentative approval to purchase the contract, RCM tells the consumer that he/she has been "approved for financing." If the consumer agrees to purchase a vehicle, a RCM employee prepares the retail installment sales contract and other form-documents related to the transaction. The consumer signs the documents, thereby becomes the vehicle's owner, and takes delivery of the vehicle.

5.     Problems occur when RCM later finds itself unable to satisfy all of the stipulations required by the investment company and the investment company refuses to purchase the contract from RCM. Although RCM's contract with the consumer contains no lawful provision conditioning the sale of the vehicle and RCM's related extension of credit upon RCM's subsequent sale of the contract to an investment company, RCM sometimes will refuse to hold the paper and honor RCM's contract with the consumer, which results in an illegal "spot delivery" or "yo-yo" transaction.

6.      Sometimes when RCM finds that it cannot sell the contract, RCM will deceive or coerce the consumer into providing additional paperwork, or require the consumer to provide a co-borrower, or require a larger down payment, or require the consumer to sign a new contract on different terms.  Alternatively or eventually, RCM will breach the contract and demand that the consumer return the vehicle to RCM, sometimes falsely accusing the consumer of stealing the vehicle and threatening to file a false police report and involve law enforcement.  Ultimately, RCM will unlawfully repossess and convert the consumer's vehicle.

7.      In a widely distributed May 22, 1989 Opinion Letter, the Michigan Department of Commerce, Financial Institutions' Bureau, stated that in the Bureau's opinion, it is unlawful for a motor vehicle installment seller to condition a sale on the seller's subsequent success in selling the retail installment sales contract to a third party purchaser of the contract.  The State of Michigan on its website continues to make the letter available to consumers at http://www.michigan.gov/documents/cis_ofis_spotdel_24239_7.pdf.

8.      In an advisory dated April 11, 2000, the Michigan Department of Commerce, Financial Institutions' Bureau warned consumers about spot delivery, stating: "[T]he dealer has the choice whether to assign the contract.  The dealer has sole control over the effort it will make to assign a contract. . . . A motor vehicle installment sale contract conditioned upon the contract's assignment to a finance company violates the [Motor Vehicle Sales Finance Act]. Such a provision is not enforceable. . . . [T]he contract is <u>not</u> void.  It is legally enforceable.  You are still responsible for making the payments as required by the contract.  If the dealer requests that you return to sign a new contract, you are not required to do so."  The State of Michigan on its website continues to make the advisory available to consumers at

3

http://www.michigan.gov/documents/cis_ofis_spotdeli_23752_7.pdf.

9.      In Bulletin 2013-08-CF issued April 1, 2013, the Michigan Department of

Insurance and Financial Services stated that automobile dealers "invented the practice of spot

delivery" in which "[a]lthough the buyer has possession of the automobile, if the seller

determines that the contract cannot be assigned, the buyer must either return the vehicle to the

seller, pay full price for the vehicle (i.e. the contract is accelerated), or face repossession. In

practice, the seller contacts the buyer, explains that the financing was not approved and demands

the vehicle be returned or be repossessed. . . .  An installment sales contract that requires the

buyer to assent to a spot delivery acceleration clause if the seller fails to assign the contract is

inconsistent with the [Motor Vehicle Sales Finance Act, MCL 492.114(b)]. Therefore, spot

deliver practices engaged in by motor vehicle installment sellers violate the Motor Vehicle Sales

Finance Act."

10.      On April 11, 2013, the Michigan Automobile Dealers Association issued a Dealer

Advisory captioned "NOTICE TO DEALERS – Department of Insurance and Finance Services

Issues Bulletin With Respect to Spot Delivery," warning that "'Spot delivery' practices engaged

in by motor vehicle installment sellers violate the Motor Vehicle Sales Finance Act.  Penalties

range from conviction of a misdemeanor and a $500 fine to suspension or revocation of the

dealer's retail installment sales license.  The position set forth in this most recent bulletin from

the Department has long been its policy. . . . Dealers are urged to review Sections 3-3.4 of the

Dealer Manual with respect to spot delivery."

11.      The Michigan Secretary of State Dealer Manual, § 3-3.4, states that "a finance

contract is between the purchaser and the dealer. Typically, the dealer assigns the Motor Vehicle

4

Installment Sales Contract to a finance company and then places a lien on the vehicle's title to secure payment.  If the finance company subsequently rejects the loan contract after interest in the vehicle transfers to the purchaser, it becomes the dealer's responsibility to offer financing to the purchaser under the same terms (e.g., interest rate, payment schedule, etc.) as the original finance contract.  This may require that the purchaser make the payments directly to the dealer."  The manual expressly warns: *"NOTE: It is a violation of state law to attempt 'repossession' of a vehicle after delivery or to change the terms of the finance contract if a finance company refuses the contract after a spot delivery*."  The Michigan Secretary of State Dealer Manual provides dealers with information regarding compliance with the Michigan Vehicle Code and is available online at http://www.michigan.gov/documents/sos/Dealer_Manual_Chapter_3_186042_7.pdf.

12.  Mr. Stone is a victim of RCM's unlawful spot delivery/yo-yo practices.  RCM violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*; the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, *et seq.*; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*;  the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901 *et seq.*;  the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), M.C.L. § 492.101 *et seq.*; and the Michigan Uniform Commercial Code, M.C.L. § 440.9101 *et seq.* ("MUCC") and breached its contract with plaintiff.  RCM also committed fraud and converted Mr. Stone's property.

## II.  Jurisdiction

13.  This Court has jurisdiction under 15 U.S.C. § 1640(e) (TILA), 15 U.S.C. § 1691e(f) (ECOA), and 15 U.S.C. § 1691p (FCRA).  This Court has supplemental jurisdiction regarding plaintiff's state law claims under 28 U.S.C. § 1367.  Declaratory relief is available

pursuant to 28 U.S.C. §§ 2201 and 2202.  Venue in this district is proper because all of the

pertinent events took place in the Western District of Michigan.

**III.    Parties**

14.    Plaintiff Harvey Stone III is an individual who resides in Ingham County,

Michigan.

15.    Defendant Rose City Motors, Inc. is a Michigan corporation.  RCM does business

at various locations in Michigan, including 3450 Ann Arbor Road, Jackson, Michigan 49202.

The registered agent for RCM is Denny Donaldson, 3450 Ann Arbor Road, Jackson, Michigan

49202.  RCM is licensed (No. B-007201) by the State of Michigan to sell used motor vehicles at

retail.

16.    RCM originates motor vehicle installment sales contracts and is licensed

(No. IS-18360) by the State of Michigan as a Motor Vehicle Installment Seller.

17.    At all times relevant hereto, RCM regularly extended or offered to extend

consumer credit for which a finance charge was imposed or which, by written agreement, was

payable in more than four installments.  RCM is identified on the face of the retail installment

sales contracts that it originates as the entity to whom the debt arising from the consumer credit

transaction is or was initially payable.  RCM is a "creditor" within the meaning of the TILA,  15

U.S.C. § 1602(f) and Regulation Z, § 226.2(a)(17).

**IV.    Facts**

18.    In November 2014, Mr. Stone went to the RCM dealership to purchase a used

motor vehicle on credit.

19.    Mr. Stone provided truthful financial information to RCM regarding his

6

employment, income and obligations.

20.     RCM accessed and obtained Mr. Stone' consumer report (commonly known as a "credit report") from one or more of the three national consumer reporting agencies.

21.     One or more RCM employees reviewed and used Mr. Stone' consumer report to decide whether to sell Mr. Stone a motor vehicle on credit.

22.     RCM's employee told Mr. Stone that he would need co-signer in order to purchase a motor vehicle from RCM on credit.

23.     Mr. Stone's cousin, Robert Daryle Hampton, agreed to co-sign for Mr. Stone's credit purchase of a motor vehicle from RCM.

24.     A RCM employee represented to Mr. Stone that with Mr. Hampton as a co-signer, Mr. Stone's credit purchase of a motor vehicle from RCM had been approved.

25.     RCM agreed to sell Mr. Stone (with Mr. Hampton as co-buyer and co-obligor) on credit a used 2010 Cadillac DTS (the "Cadillac"), VIN 1G6KD5EY7AU127415.

26.     Mr. Stone provided RCM with a down payment of $1,000.00 toward his purchase of the Cadillac.

27.     RCM prepared multiple documents to be signed by the parties in connection with Mr. Stone's purchase of the Cadillac.  Included in the documents was a retail installment sales contract ("RISC").

28.     The RISC, dated November 14, 2014, made the following disclosures:

| | |
|---|---|
| Annual Percentage Rate | 14.60% |
| Finance Charge | $10,529.44 |
| Amount Financed | $20,774.00 |

| | |
|---|---|
| Total of Payments | $31,303.44 |
| Total Sale Price | $32,303.44 |

The RISC stated that the vehicle's Cash Price (excluding sales tax) was $19,621.70.  The RISC

obligated Mr. Stone to make 72 monthly payments of $434.77, with the first payment due

beginning December 14, 2014.  A copy of the RISC is attached hereto as Exhibit A.

29.     The RISC was signed by Mr. Stone and Mr. Hampton on November 14, 2014.

30.     The RISC was signed by RCM.

31.     When Mr. Stone and Mr. Hampton signed the RISC, they became legally

obligated to accept the terms and credit arrangement stated in the RISC.

32.     RCM sold the Cadillac to Mr. Stone and Mr. Hampton on November 14, 2014.

33.     The credit sale of the Cadillac from RCM to Mr. Stone and Mr. Hampton was

consummated on November 14, 2014 when Mr. Stone and Mr. Hampton signed the RISC and

thereby became legally obligated to accept the terms and credit arrangement stated in the RISC.

34.     RCM is identified in the RISC as the "Seller-Creditor."  RCM also is identified in

the RISC as "we" and "us."

35.     Mr. Stone and Mr. Hampton are identified in the RISC as the "Buyer" and

"Co-Buyer."  Mr. Stone and Mr. Hampton also are identified in the RISC as "you."

36.     The RISC stated: "You agree to pay the Seller-Creditor . . . the Amount Financed

and Finance Charge in U.S. funds according to the payment schedule below."

37.     The RISC contained language whereby RCM had the option to assign and sell the

RISC to a third party.

38.     The RISC did not obligate RCM to assign and sell the RISC to a third party.

39.     The RISC obligated Mr. Stone and Mr. Hampton to pay RCM under the terms of the RISC, unless and until RCM exercised its option to assign and sell the RISC to a third party.

40.     RCM is identified on the face of the RISC as the entity to whom the debt from the transaction was initially payable, making RCM the creditor in the transaction.

41.     The RISC stated no condition that had to be satisfied before the RISC was enforceable by RCM, or any successor or assign.

42.     The RISC stated no condition that had to be satisfied before the RISC was enforceable by Mr. Stone or Mr. Hampton.

43.     The RISC contained no language that would make the credit sale of the Cadillac to Mr. Stone and Mr. Hampton contingent upon RCM assigning and selling the RISC to a third-party finance company, investor or any other entity.

44.     The RISC contained no language stating that RCM would not be bound by the RISC if RCM did not exercise its option to assign and sell the RISC to a third-party finance company, investor or any other entity.

45.     The RISC contained no language stating that RCM would not be bound by the RISC if RCM was unable to assign and sell the RISC to a third-party finance company, investor or any other entity.

46.     RCM stated to Mr. Stone and Mr. Hampton that RCM intended to later assign and sell the RISC to an entity named JP Morgan Chase Bank, N.A. ("Chase").

47.     RCM did not assign and sell the RISC to Chase or any other entity.

48.     RCM chose not to assign and sell the RISC to Chase or any other entity.

49.     Chase chose not to purchase the RISC from RCM.

50.     In connection with the transaction, RCM also prepared an Application for Michigan Title, Statement of Vehicle Sale (Form RD-108), which expressly stated: "I CERTIFY I SOLD THIS VEHICLE TO THE PURCHASER NAMED IN THIS FORM." The Form RD-108 was signed by RCM as seller and by Mr. Stone and Mr. Hampton as purchasers.

51.     Title to the Cadillac passed to Mr. Stone and Mr. Hampton at the moment the Application for Michigan Title, Statement of Vehicle Sale (Form RD-108) was signed by Mr. Stone, Mr. Hampton and RCM, without regard to whether the document was ever mailed or delivered to the Michigan Secretary of State. *Perry v. Golling Chrysler Plymouth Jeep, Inc.,* 477 Mich. 62 (2007).

52.     In connection with the transaction, RCM prepared an Odometer Disclosure Statement, which described the Cadillac, and which named RCM as the transferor and Mr. Stone and Mr. Hampton as the transferee. The Odometer Disclosure Statement was signed by RCM, Mr. Stone and Mr. Hampton.

53.     On or about November 14, 2014, Mr. Stone took possession of the Cadillac.

54.     RCM filed the above-described Form RD-108 with the Michigan Secretary of State.

55.     On November 26, 2014, the State of Michigan issued a Certificate of Title for the Cadillac, naming Mr. Stone and Mr. Hampton as the owners and naming Chase as the first secured party. A copy of the certificate of title is attached as Exhibit B.

56.     Because Chase chose not to purchase the RISC from RCM, RCM began to shop the RISC to other entities.

57.     In November and December of 2014, RCM contacted multiple third parties in

unsuccessful efforts to sell the RISC and caused multiple third parties to access the credit reports of Mr. Stone and Mr. Hampton and send adverse action notices to Mr. Stone and Mr. Hampton, giving notice that the third parties had denied the applications for credit instigated by RCM and thereby harming the credit scores of Mr. Stone and Mr. Hampton.

58.     Although the RISC provided that Mr. Stone's first monthly payment would be due on before December 14, 2014, neither Mr. Stone nor Mr. Hampton ever received any payment book or other information from Chase, RCM or any other entity regarding where to make the monthly payments for the Cadillac.

59.     Prior to December 14, 2014, Mr. Stone communicated by telephone with a RCM employee.  In the ensuing conversation, the RCM employee stated to Mr. Stone that because Chase had decided not to purchase the RISC from RCM, Mr. Stone would have to return the Cadillac to RCM.  Mr. Stone would not agree to return the Cadillac to RCM.  Mr. Stone insisted upon enforcing the contract and stated that he would make monthly payments to RCM or its assignee pursuant to the terms of the contract. The RCM employee refused to provide Mr. Stone with information regarding where he should make his monthly payments when due.  The RCM employee stated that Mr. Stone had only two choices: Mr. Stone could voluntarily return the Cadillac to RCM and obtain a refund of his $1,000.00 down payment; or RCM would repossess the Cadillac, keep Mr. Stone's $1,000.00 down payment, and sue Mr. Stone for the costs of repossession and other expenses.

60.     On or before December 22, 2014, Mr. Stone communicated by telephone with a RCM employee named Tyler Lehmann.  Mr. Lehmann stated that he was a Finance Manager at RCM.  In the ensuing conversation, Mr. Lehmann made the following representations to Mr.

11

Stone:

a) Chase had chosen not to purchase the RISC because Chase had obtained a report from CARFAX, Inc. disclosing that the Cadillac was a "lemon" that had been repurchased by the manufacturer from the original owner.

b) RCM was not aware when RCM purchased the Cadillac at auction that the vehicle was a repurchased "lemon."

c) RCM was not aware when RCM sold the Cadillac to Mr. Stone and Mr. Hampton that the vehicle was a repurchased "lemon."

d) RCM is required to send the Cadillac back to the auction.

e) The Cadillac cannot be financed because it is a repurchased "lemon."

f) The Cadillac has suffered hail damage, frame damage, and has a title that is no different than a "salvage title."

g) The Cadillac is worth only twenty-five percent of the price that RCM had charged Mr. Stone and Mr. Hampton for the vehicle.

h) Mr. Stone and Mr. Hampton had done nothing wrong and that it was RCM's fault that Chase would not buy the RISC because RCM had failed to obtain its own CARFAX report for the Cadillac.

Mr. Stone stated that he intended to keep the Cadillac and that he would be making his monthly payments directly to RCM. Mr. Lehmann replied that Mr. Stone could not make monthly payments to RCM because RCM is not a bank. Mr. Lehmann stated that Mr. Stone had only two choices: Mr. Stone could voluntarily return the Cadillac to RCM and obtain a refund of his $1,000.00 down payment; or RCM would repossess the Cadillac and keep Mr. Stone's $1,000.00

12

down payment.

61.     The above-described representations made by Mr. Lehmann to Mr. Stone were false.  In fact, when RCM purchased the Cadillac at auction, RCM (along with all other bidders at the auction) were provided detailed information regarding the Cadillac's title history, including the fact that the Cadillac was repurchased by the manufacturer when the vehicle had 9,567 miles on the odometer and was given a "lemon" title by the State of New Jersey on September 12, 2011.  An AutoCheck Vehicle History Report similar to what RCM would have received at auction prior to purchasing the Cadillac, which discloses the Cadillac's "Lemon Title" is attached as Exhibit C.  Regardless, and for reasons stated below, RCM was required to honor its contract with Mr. Stone and Mr. Hampton, regardless of RCM's failure to sell the RISC to Chase or some other third party investor.

62.     On or about January 22, 2015, RCM's agents and/or employees arrived unannounced at Mr. Stone's place of employment, The Markerboard People, Inc., 1611 North Grand River Avenue, Lansing, Michigan 48906 and repossessed Mr. Stone's Cadillac in the plain view of Mr. Stone's employer, managers, co-workers and customers.  Mr. Stone first became aware that the repossession was taking place when Mr. Stone's manager went to Mr. Stone and stated that someone was in the parking lot repossessing Mr. Stone' Cadillac.

63.     RCM's repossession of the Cadillac caused Mr. Stone to suffer extreme embarrassment and humiliation.

64.     RCM's employees and/or agents delivered the repossessed Cadillac to RCM.

65.     Mr. Stone was entitled to exclusive possession of the Cadillac when RCM and its employees and/or agents repossessed the Cadillac and delivered the Cadillac to RCM.

13

66.     RCM's employees and/or agents converted the Cadillac to their own use.

67.     RCM converted the Cadillac to its own use.

68.     RCM received, possessed, and refused to return the converted Cadillac, knowing that the Cadillac had been converted.

69.     RCM sold the Cadillac to Mr. Stone and Mr. Hampton in an arms-length transaction for a cash price (excluding sales tax) of $19,621.70.

70.     When RCM converted the Cadillac, the Cadillac had a fair market value of $19,621.70.

71.     RCM breached is contract with Mr. Stone and Mr. Hampton.

72.     Mr. Stone and Mr. Hampton at no time breached their contract with RCM.

73.     Mr. Stone and Mr. Hampton purchased the Cadillac primarily for personal, family and household purposes.

74.     RCM's agreement to finance the purchase of the Cadillac, as stated in the RISC, was a material term in the decision by Mr. Stone and Mr. Hampton to purchase the Cadillac from RCM.

75.     Mr. Stone and Mr. Hampton to their detriment relied upon the financial disclosures made by RCM in the RISC.

76.     The unlawful acts of RCM and employees and agents caused Mr. Stone to suffer substantial, actual damages.

77.     RCM did not provide Mr. Stone with a timely written statement regarding the dealership's action on his application for credit or with a written statement of the reasons why RCM denied an extension of credit or alternatively revoked an extension of credit.

14

## V.     Claims For Relief

### Count 1 — Truth in Lending Act

78.     Plaintiff incorporates the foregoing paragraphs by reference.

79.     The TILA required RCM as creditor to disclose as the "amount financed" the amount of credit of which plaintiff as debtor had actual use.  The TILA defines "credit" as "the right granted by a creditor to a debtor to defer payments of debt or to incur debt and defer its payment."  The RISC stated a specific "amount financed" in connection with the transaction between RCM and plaintiff.

80.     The TILA defines "creditor" as the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness."  15 U.S.C. § 1602(f)(2).  In this case, the RISC named RCM.  Thus, RCM was the *creditor* in the transaction.  *Riviere v. Banner Chevrolet, Inc.,* 184 F.3d 457 (5th Cir. 1999).

81.     RCM violated the TILA in its transaction with plaintiff because the RISC unconditionally represented that RCM had granted plaintiff credit on specified terms as stated in the TILA disclosures contained therein, when in fact the information was false, inaccurate and misleading because the credit granted by RCM in the transaction actually was illusory and (at least according to RCM) conditioned upon RCM's ability to sell the RISC to a third-party finance company.  Thus, plaintiff never had actual use of the credit as represented by RCM in the TILA disclosures contained in the RISC.

82.     RCM violated the TILA by failing to comply with the disclosure requirements of 15 U.S.C. §§ 1631, 1632 and 1638, and Regulation Z, 12 C.F.R. §§ 226.17 and 226.18.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)    A declaratory judgment that RCM has violated the TILA;

b)    Actual damages pursuant to 15 U.S.C. § 1640(a)(1);

c)    Statutory damages pursuant to 15 U.S.C. § 1640(a)(2);

d)    Costs of the action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1640(a)(3); and

e)    Such further relief as the Court deems appropriate.

### Count 2 — Equal Credit Opportunity Act

83.    Plaintiff incorporates the foregoing paragraphs by reference.

84.    Plaintiff is an "applicant" as the term is defined in the ECOA, 15 U.S.C. § 1691a(b).

85.    RCM is a "creditor" as the term is defined in the ECOA, 15 U.S.C. § 1691a(e).

86.    Plaintiff completed a credit application and applied to RCM for credit in connection with the purchase of the Cadillac from RCM.

87.    RCM denied plaintiff credit and/or revoked plaintiff's credit, which denial and/or revocation constituted "adverse action" as the phrase is defined in the ECOA, 15 U.S.C. § 1691(d)(6).

88.    RCM failed to provide plaintiff with a notice of adverse action as required by the ECOA, 15 U.S.C. § 1691(d).

**Wherefore,** plaintiff seeks judgment against RCM for:

a)    A declaratory judgment that RCM has violated the Equal Credit Opportunity Act, pursuant to 15 U.S.C. § 1691e(c);

b)    Actual damages pursuant to 15 U.S.C. § 1691e(a);

16

c)   Punitive damages in an amount not to exceed $10,000.00, pursuant to 15 U.S.C. § 1691e(b);

d)   Costs of the action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1691e(d); and

e)   Such further relief as the court deems appropriate.

### Count 3 — Fair Credit Reporting Act

89.   Plaintiff incorporates the foregoing paragraphs by reference.

90.   Plaintiff is a "consumer" as the term is defined in the FCRA, 15 U.S.C. § 1681a(c).

91.   RCM is a "person" as the term is defined in the FCRA, 15 U.S.C. § 1681a(b).

92.   RCM took "adverse action" as the phrase is defined in the FCRA, 15 U.S.C. § 1681a(k), with respect to plaintiff, based in whole or in part on information contained in a consumer report.

93.    RCM willfully failed to provide plaintiff with a notice of adverse action as required by the FCRA, 15 U.S.C. § 1681m, thereby violating 15 U.S.C. § 1681n.  In the alternative, RCM negligently failed to provide plaintiff with a notice of adverse action as required by the FCRA, 15 U.S.C. § 1681m, thereby violating 15 U.S.C. § 1681o.

**Wherefore**, plaintiff seeks judgment against RCM for:

(a)   A declaratory judgment that RCM has violated the Fair Credit Reporting Act;

(b)   Actual damages pursuant to 15 U.S.C. § 1681n(a)(1) and/or § 1681o(a)(1);

(c)   Statutory damages pursuant to 15 U.S.C. § 1681n(a)(1);

(d)   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

17

(e)    Costs of the action, together with a reasonable attorney's fee, pursuant to 15 U.S.C. § 1681n(a)(3) and/or § 1681o(a)(2); and

(f)    Such further relief as the court deems appropriate.

### Count 4 — Michigan Consumer Protection Act

94.    Plaintiff incorporates the foregoing paragraphs by reference.

95.    RCM's sale and financing of the Cadillac to plaintiff through the use of a retail installment sales contract was an "act or practice in the conduct of trade or commerce" as the phrase is defined and used in the Michigan Consumer Protection Act, M.C.L. § 445.901 *et seq.*

96.    RCM repeatedly violated the Michigan Consumer Protection Act by using unlawful, unfair, unconscionable and deceptive methods, acts and practices in the conduct of trade and/or commerce.  Specifically:

a)    RCM caused a probability of confusion or of misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction, in violation of M.C.L. § 445.903(1)(m);

b)    RCM caused a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction, in violation of M.C.L. § 445.903(1)(n);

c)    RCM caused a probability of confusion or of misunderstanding as to the terms or conditions of credit extended in a transaction, in violation of M.C.L. § 445.903(1)(o);

d)    RCM represented or implied that the subject matter of a consumer transaction (in this case, financing) would be provided promptly, or at a specified time, or within

a reasonable time, when RCM knew or had reason to know that it would not be so provided, in violation of M.C.L. § 445.903(1)(q);

e)   RCM failed to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known to the consumer, in violation of M.C.L. § 445.903(1)(s);

f)   RCM represented to plaintiff that he would receive a benefit (in this case, financing) as an inducement for entering into a transaction to purchase the vehicle, when in fact the benefit was contingent on an event (the sale of the retail installment sales contracts to a third-party investment company) to occur subsequent to the transaction, in violation of M.C.L. § 445.903(1)(w);

g)   RCM made a representation of facts or a statement of facts material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of M.C.L. § 445.903(1)(bb); and

h)   RCM failed to reveal facts that are material to the transaction in light of representations of fact made in a positive manner, in violation of M.C.L. § 445.903(1)(cc).

97.   Plaintiff suffered loss as a result of RCM's violations of the MCPA.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)   A declaratory judgment that RCM's practices violate the Michigan Consumer Protection Act;

b)   An order requiring RCM to repair any damage that it may have done

19

to plaintiff's credit through the reporting of derogatory credit information

to any credit reporting agency or by causing excessive inquiries to appear in

plaintiff's credit history;

c)     Actual damages or $250.00, whichever is greater, pursuant to M.C.L. §

445.911(2);

d)     Reasonable attorney's fees pursuant to M.C.L. § 445.911(2); and

e)     Such further relief as the Court deems appropriate.

**Count 5 — Michigan Motor Vehicle Sales Finance Act**

98.     Plaintiff incorporates the foregoing paragraphs by reference.

99.     RCM is an "installment seller" and a "seller" as the terms are defined in the

MVSFA.  RCM is a "holder" as the term is defined in the MVSFA.  Plaintiff is an "installment

buyer" and a "buyer" as the terms are defined in the MVSFA.

100.    The MVSFA states:  "An installment sales contract shall be in writing, and shall

contain all of the agreements between the buyer and the seller relating to the installment sale of

the motor vehicle sold, and shall be signed by both the buyer and the seller." M.C.L. §

492.112(a).

101.    The MVSFA states:  "An installment sales contract shall not be signed by a party

unless it contains all of the information and statements required by this act." M.C.L. §

492.114(a).

102.    The MVSFA states:  "An installment sales contract shall not contain a provision

by which the buyer waives a right of action against the seller, holder, or other person acting on

behalf of the holder for an illegal act committed . . . in the repossession of a motor vehicle . . . ."

20

M.C.L. § 492.114(d).

103.     The MVSFA states:  "No act, agreement or statement by any buyer in any

installment sale contract shall constitute a valid waiver of any provision of this act intended by

the legislature for the benefit and protection of retail installment buyers of motor vehicles."

M.C.L. § 492.132.

104.     The MVSFA requires that each retail installment contract shall separately

disclose the various terms of credit, including the motor vehicle's cash price, amount of down

payment, unpaid cash price balance, cost of any insurance or travel emergency benefits procured

by the seller, other necessary or incidental costs which the seller contracts to pay on behalf of the

buyer, principal amount financed, amount of the finance charge, the time balance, and the

amount and due date of each payment required.  M.C.L. § 492.113.

105.     RCM did not comply with the disclosure requirements of the MVSFA

because it represented to plaintiff that it had unconditionally granted credit to plaintiff on the

terms specified in the RISC, when in fact, and according to RCM, the information was false,

inaccurate and misleading because the granting of credit on the disclosed terms was conditioned

upon RCM's ability to sell the RISC to a third-party investor.

106.     RCM failed to disclose the finance charge to plaintiff as required by the

MVSFA because the purported extension of credit, according to RCM, was conditional, and

therefore illusory.

**Wherefore,** plaintiff seeks judgment against RCM for:

(a)     A declaration that RCM has violated the MVSFA by claiming that the extension

          of credit to plaintiff was conditioned upon RCM's ability to sell the RISC to a

21

third-party investor.

(b)    A declaration that RCM's claim that it did not extend credit to plaintiff under the terms of the RISC and/or that the extension of credit to plaintiff under the terms of the RISC was conditioned upon a subsequent event, that is, RCM's ability to sell the RISC to a third-party investor, was unenforceable and a violation of the MVSFA.

(c)    An injunction, prohibiting RCM from further violations of the MVSFA;

(d)    Reasonable costs, attorneys' fees, and pre-judgment and post-judgment interest; and

(e)    Such further relief as the Court deems appropriate.

### Count 6 — Breach of Contract

107.    Plaintiff incorporates the foregoing paragraphs by reference.

108.    Plaintiff entered into the RISC with RCM, with set terms regarding price, financing, payment, and possession of the vehicle.  These contract terms were material to plaintiff.

109.    The RISC between plaintiff and RCM contained no language making the contract conditional upon RCM's success in selling the contract to an investor or other third-party.

110.    Alternatively, any alleged agreement between RCM and plaintiff that contained language making the contract conditional upon RCM's success in selling the contract to an investor or other third-party, was unlawful and unenforceable.

111.    RCM breached its contract with plaintiff.  Each breach was material.

22

112.   Plaintiff has suffered loss as a result of RCM's breach of contract.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)   A declaratory judgment that RCM's practices constitute a breach of contract;

b)   Actual damages;

c)   Exemplary damages;

d)   Costs;

e)   Reasonable attorney's fees;

f)   An order requiring RCM to repair plaintiff's credit history in the event RCM has reported any derogatory credit information to any credit reporting agency or caused excessive inquiries to appear in plaintiff's credit history in connection with plaintiff's purchase and finance of a vehicle, and the resulting repossession; and

g)   Such further relief as the Court deems appropriate.

### Count 7 — Fraud

113.   Plaintiff incorporates the foregoing paragraphs by reference.

114.   RCM intentionally induced plaintiff to execute the RISC by representing to plaintiff that his financing had been approved unconditionally, when in fact RCM knew that such representations were false when made because RCM knew when plaintiff executed the RISC that no investor or other third-party finance company had agreed unconditionally to purchase the RISC from RCM and because RCM had no intention of extending credit to plaintiff on the terms disclosed in the RISC unless RCM was successful in selling the contract to an investor or other third-party finance company.

115.   The misrepresentations by RCM that plaintiff's financing had been approved

without condition were material to the transaction.  However, plaintiff could not reasonably have known that the representations of RCM were false when made.

116.    Plaintiff reasonably relied to his detriment upon the fraudulent misrepresentations and omissions of fact by RCM.

117.    The acts and omissions of RCM were done with malice and/or reckless disregard for the rights of plaintiff.

118.    The acts and omissions of RCM caused plaintiff to suffer actual damages, as well as injury to feelings that stem from the outrage, distress and embarrassment, caused by defendant's egregious and fraudulent scheme.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)    Actual damages;

b)    Exemplary damages;

c)    Costs;

d)    Reasonable attorney's fees;

e)    An order requiring RCM to repair plaintiff's credit history in the event RCM has reported any derogatory credit information to any credit reporting agency or caused excessive inquiries to appear in plaintiff's credit history in connection with plaintiff's purchase and finance of a vehicle, and the resulting repossession; and

f)    Such further relief as the Court deems appropriate.

### Count 8 — Michigan Uniform Commercial Code

119.    Plaintiff incorporates the foregoing paragraphs by reference.

120.    RCM violated Article Nine of the MUCC, M.C.L. § 440.9101 *et seq.*, when

24

it took possession of plaintiff's vehicle, contrary to the default and repossession remedies of Article 9 of the Uniform Commercial Code.

121.   RCM violated the MUCC, M.C.L. § 440.1203, when it breached its obligation of good faith by inducing plaintiff to sign the RISC by misrepresenting that plaintiff had been approved unconditionally for financing, by falsely declaring plaintiff to be in default of the contract, and by wrongfully repossessing plaintiff's vehicle.

122.   Plaintiff has suffered loss as a result of RCM's multiple violations of the MUCC.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)   A declaratory judgment that RCM's practices violate the Michigan Uniform Commercial Code;

b)   Actual damages;

c)   Statutory damages of an amount of not less than the credit service charge under each contract, plus 10% of the principal amount of the debt, or the time price differential plus 10% of the cash price, pursuant to the MUCC;

d)   Costs of the action, together with a reasonable attorney's fee; and

e)   Such further relief as the Court deems appropriate.

### Count 9 — Common Law Conversion and Statutory Treble Damages

123.   Plaintiff incorporates the foregoing paragraphs by reference.

124.   At all times relevant hereto, plaintiff had the exclusive right to the immediate possession of the Cadillac.

125.   RCM converted plaintiff's Cadillac.

25

126.   RCM knowingly converted plaintiff's Cadillac.

127.   RCM received and possessed the Cadillac.

128.   RCM received and possessed the Cadillac, knowing that the Cadillac had been converted.

129.   Plaintiff has suffered loss as a result of the conversion of the Cadillac.

**Wherefore,** plaintiff seeks judgment against RCM for:

a)   A declaratory judgment that RCM's practices constituted conversion of plaintiff's Cadillac;

b)   Actual damages for common law conversion, equal to the fair market value of the vehicle at the time of conversion;

c)   Treble damages pursuant to M.C.L. § 600.2919a; calculated as three times the fair market value of the vehicle at the time of conversion;

d)   Costs pursuant to M.C.L. § 600.2919a;

e)   Reasonable attorney's fees pursuant to M.C.L. § 600.2919a; and

f)   Such further relief as the Court deems appropriate


**Demand for Trial by Jury**

Plaintiff demands trial by jury.


Dated: February 12, 2015                    /s/ Phillip C. Rogers
                                            Phillip C. Rogers (P34356)
                                            Attorney for Plaintiff
                                            40 Pearl Street, N.W., Suite 336
                                            Grand Rapids, Michigan 49503
                                            (616) 776-1176
                                            ConsumerLawyer@aol.com

26